41 C.C.P.A. (Patents)

## CISLAK v. WAGNER.

### Patent Appeal No. 6021.

United States Court of Customs and Patent Appeals.

May 27, 1954.

Rehearing Denied Sept. 15, 1954.

Stone, Boyden & Mack, Washington, D. C. (J. Austin Stone and Donald C. Roylance, Washington, D. C., of counsel), for appellant.

J. Paul Jones, Washington, D. C., for appellee.

Before O'CONNELL, JOHNSON, WORLEY, COLE, and JACKSON (retired), Judges.

COLE, Judge.

This is an appeal in a patent interference proceeding in which the appellant, Francis E. Cislak, seeks review and reversal of a decision by the Board of Interference Examiners of the United States Patent Office awarding priority of invention of the subject matter contained in the single count in interference to the appellee, Cary R. Wagner.

The count relates to the production of vinyl pyridine by dehydrogenation from ethyl pyridine and reads as follows:

"A process of producing a vinyl pyridine which comprises passing the vapors of an ethyl pyridine over a solid dehydrogenation catalyst at a temperature within the range of approximately 500° C. to approximately 650° C. to pro-

duce a vinyl pyridine and recovering the thus produced vinyl pyridine."

The Wagner application in interference, Serial No. 43,237, was filed on August 9, 1948 and is claimed to be a division of an application, Serial No. 511,-892, filed November 26, 1943. The Cislak application in interference, Serial No. 60,181, was filed November 15, 1948 and is a continuation of an earlier application, Serial No. 514,970, filed December 20, 1943.

The Board of Interference Examiners, in its opinion, determined that the earlier filed application of each party sufficiently disclosed and supported the present count and accordingly, based on the respective filing dates of such prior applications, Wagner was designated as the senior party and Cislak, the junior party, was charged with the burden of establishing his case by a preponderance of the evidence. Following its appraisal of the testimony and exhibits of record, the board held that the process of the count was conceived first by Wagner on July 13, 1943 and thereafter by Cislak on July 23, 1943. The board further held, as indicated, that Wagner was entitled to the benefit of the date of November 26, 1943, the date of the filing of his earlier application, as a constructive reduction to practice of the invention set forth in the count. Wagner had not contended otherwise. An actual reduction to practice by Cislak, as alleged, was not, in the opinion of the board, substantiated by the Cislak proofs of record and therefore the board restricted Cislak to the date of the filing of his prior co-pending application, December 20, 1943, as a constructive reduction to practice. Thus, the board's award of priority to party Wagner was based on the premise that Wagner was first to conceive and first to reduce to practice.

Preliminary to our review of the principal contentions contained in appellant Cislak's assignment of errors, it is well to note that, as originally filed, the above identified parent and continuation applications of party Cislak included William H. Rieger as a co-inventor. At the outset of the present interference, a joint preliminary statement was filed by Cislak and Rieger alleging a first written description of the invention on July 2, 1943, disclosure to others on the same date, and an actual reduction to practice on July 7, 1943. Upon subsequent discovery of a mislaid memorandum (Cislak Exhibit 2), to which we will hereinafter refer in some detail, Cislak and Rieger entered a motion to convert from a joint to a sole application in which Cislak alone was to be constituted as the inventor of the subject matter of the present count. Over objection of party Wagner, the Primary Examiner granted the motion and redeclared the interference with Cislak appearing as the sole inventor. A substitute preliminary statement was thereafter entered by Cislak in which he alleged a first written description of the invention of the count on August 14, 1941, disclosure to others on September 2, 1941 and October 21, 1942, further written description and disclosure to others on July 2, 1943, and an actual reduction to practice on July 7, 1943. It should here be noted that the only purpose to be attributed to Cislak in effecting the stated conversion was one in the interest of accuracy of inventorship as such substituted statement, entered before the Wagner statement was opened, did not antedate the filing date of the earlier Wagner application.

It appears from the record that Dr. Cislak and Dr. Wagner are eminently qualified chemists of long experience, the former being Director of Research at the Reilly Tar and Chemical Corporation and the latter being a consulting chemist of Phillips Petroleum Company. It further appears that shortly after the entry of the United States into World War II, a pressing need developed for vinyl pyridine in quantitative amounts for use in connection with the production of numerous rubber products. To satisfy this demand, various methods were employed prior to the invention

outlined in the process of the count in interference.

There is no dispute that the earlier filed Cislak application does, in fact, support the present count. In the proceedings below, however, Cislak strenuously contended that Wagner's first application did not support the count and, to this end, a motion to shift the burden of proof to Wagner was filed. This motion was not entertained and the board credited Wagner with a constructive reduction to practice as aforesaid, predicated on Wagner's prior application and the disclosure found therein. Cislak alleges error by the board in so concluding. As this is a threshold question in the case, it necessarily will be first considered.

It is the appellant's position that Wagner's original application failed to disclose the process of the count but instead was directed to a two-phase process, the first phase of which was inoperative. The two-phase process set forth by Wagner is as follows: (1) Reaction of pyridine with ethylene to produce ethyl pyridine and, (2) cracking the ethyl pyridine in the presence of a dehydrogenation catalyst to produce vinyl pyridine followed by fractionation to separate the vinyl pyridine. The appellant urges that we take note of the fact that Wagner never conducted any tests or experiments in connection with his earlier disclosure, and that from the nature of the chemistry set forth in that application it is apparent that Wagner's process was not started with ethyl pyridine. Asserted proof of inoperativeness of the first step was sought to be established by testimony of Cislak's witness, Dr. Wheeler, admittedly a skilled chemist, who stated that he had attempted to synthesize ethyl pyridine from ethylene and pyridine in accordance with the teachings of Wagner's earlier application but was not able to do so. The tests made by Dr. Wheeler were not conducted in the presence of Dr. Wagner or anyone representing him. Furthermore, it was not known to Dr. Wagner that such tests had been made. In commenting on Dr. Wheeler's testimony, the board aptly, and we think correctly, stated:

"The above mentioned testimony of Wheeler is not pertinent to the issue of this interference; the count has nothing to do with the making of ethyl pyridine. Secondly, ex parte tests to show inoperativeness taken during an interference are ordinarily entitled to no weight. [Citing cases.] * * *"

In essence, Cislak's entire argument on this point is directed, as it was below, to the proposition that vinyl pyridine could not be obtained by following the operational steps outlined in Wagner's earlier application. In view of our agreement with the board's holding, as previously stated, it remains necessary only to state that we have reviewed the disclosure contained in Wagner's original application and think that the requisite elements required by the count are clearly present therein. This fact was amply and convincingly demonstrated by the appellee, in his brief, and has not affirmatively been rebutted by the appellant. It should also be noted that Cislak's own witness, Dr. Wheeler, who testified as to the inoperativeness of the initial phase of the Wagner process, further testified that vinyl pyridine could be prepared from ethyl pyridine by the methods disclosed in the first Wagner application. Another observation worthy of consideration is the fact that Wagner's original specification makes reference to several ethyl pyridines prepared by prior art processes. We thus are of the opinion that direct support is found in Wagner's original application for the count in interference.

In view of the foregoing, it is incumbent upon Cislak, as junior party, to establish conception of the process of the count prior to Wagner's conception, coupled with the required degree of diligence or, on the basis of the record before us, an actual reduction to practice of such process prior to the date of

Wagner's constructive reduction to practice on November 26, 1943. In this respect, it is well to again emphasize that the essential requirements of the process, as outlined in the count, call for the passing of ethyl pyridine vapors over the dehydrogenation catalyst within the temperature range specified and the subsequent recovery of the thus formed vinyl pryidine.

In his substituted preliminary statement, Cislak claimed conception on August 14, 1941. In support of this date, Cislak offered a record in evidence (Cislak Exhibit 2) purporting to disclose the concept of dehydrogenating ethyl pyridine to vinyl pyridine. in accordance with the process of the present count. The signature of Dr. Cislak appears on such record under date on August 14, 1941 and also the initials "FCW" under dates of September 2, 1941 and July 16, 1946. Testimony was adduced on behalf of Cislak to the effect that such initials were those of Dr. Frank C. Whitmore, deceased colleague of party Cislak, who was well known in a professional capacity to the individual witnesses so testifying. No authenticated signature or initials of Dr. Whitmore were produced for inspection or comparative purposes by these witnesses with the "FCW" on the memorandum in question.

Cislak testified that Dr. Whitmore had seen the record on September 2, 1941 and initialed it on that date. With the exception of party Cislak, however, no other witness testified as to when Exhibit 2 was made, or as to when the dates thereon appearing after Dr. Whitmore's alleged initials were written. The basic unreliability of such evidence is apparent. See Sloan v. Peterson, 129 F.2d 330, 29 C.C.P.A., Patents, 1055, where we stated that it was an essential requirement that evidence be offered to show that an exhibit (such as we construe as being comparable to Cislak Exhibit 2) was, in fact, made on the date appearing thereon. It is furthermore observed that Exhibit 2 was held to be indefinite by the board in that the structural formulae indicated thereon could have been other than ethyl pyridine and vinyl pyridine. The correctness of this holding is seemingly demonstrated by the absence of argument directed to establishing a contrary view.

Prior to October 21, 1942, Dr. Cislak allegedly disclosed the process of the count to an associate, Dr. Kransfelder, and requested that he attempt to produce ethyl pyridine by condensation of ethylene with pyridine. Dr. Kransfelder testified that he worked for several months on the project assigned to him without realizing the desired result; that he was aware that the reason for trying to make ethyl pyridine, as directed, was so that it could ultimately be converted to vinyl pyridine; and that while he knew that some work was done on the particular reaction in question, he could not state whether it was done before or after his own activity with respect to ethyl pyridine. Clearly, such testimony, in itself, is hardly an adequate foundation for the requisite knowledge required concerning the specific elements called for in the process of the count.

Proceeding further, Dr. Cislak testified that Dr. Sutherland of his research staff prepared a sufficient supply of ethyl pyridine some time prior to June, 1943, and that Dr. Rieger, also of his research staff, was thereafter assigned to the problem of dehydrogenating that material catalytically in the vapor phase. The experimentation thus following in pursuance of Dr. Cislak's instructions is, in our opinion, the critical high point of the appellant's case and accordingly has been so considered. We have carefully studied the recorded results of such experimental activity as contained in the notebook exhibits of record herein, the arguments advanced with respect thereto, and the decision rendered by the board at the conclusion of the proceedings below. While we have not been without some doubt as to the propriety of sustaining the position argued by the appellant, we feel that

the evidence of record does not justifiably dictate an outcome different than that reasoned by the Board of Interference Examiners in its opinion.

Specifically, the board stated:

"Cislak also testified that some time prior to June 30, 1943, he 'assigned to Dr. Rieger the problem of dehydrogenating ethyl pyridine catalytically in the vapor phase' and that he and Dr. Rieger discussed exactly what he was going to do and that Dr. Rieger kept a record of his activities (Cislak Exhibit No. 3) and that he saw that record from time to time and that he, Cislak, was satisfied that the process was operable and that it could be developed into a commercial method of making vinyl pyridine from an ethyl pyridine. Dr. Rieger testified on behalf of Cislak that sometime prior to June 30, 1943 Cislak 'suggested that I work on the problem of dehydrogenating ethyl pyridine to vinyl pyridine' and that Cislak suggested a certain catalyst (vanadium pentoxide) but that he, Rieger, suggested the other catalysts employed but he did not recall that Cislak specified any specific temperature to use. Rieger identified Cislak Exhibit 3 as the notebook record kept by him of the experimental work done as a result of the problem assigned to him by Cislak, and the various 'runs' recorded therein were carried out on the dates indicated in the notebook. Exhibit No. 3 indicates that Rieger carried out a number of experiments involving the cracking of ethyl pyridine to vinyl pyridine the first recorded as having been performed on '7/2/43' and the last on '10/6/43.'

"The notebook (Exhibit No. 3) includes a record of the catalyst used, temperatures, amount of material fed in the reaction, amount of product, etc. On page 1 of the notebook is recorded the indices of refraction a number of mixtures stated to consist of 2–ethyl pyridine and 2–vinyl pyridine in varying percentage ratios. This was stated by Rieger to be used in determining the amount of conversion of ethyl pyridine to vinyl pyridine in the products of the experiments by measuring the index of refraction of these products and comparing it with the data recorded on page 1."

The board was not convinced that the evidence satisfactorily indicated that Dr. Cislak had a sufficient conception of the specific process of the count when assigning Dr. Rieger to the problem in June of 1943. In this regard, the board said: "It is not sufficient that Cislak had a general idea that vinyl pyridine could be produced from ethyl pyridine by catalytic dehydrogenation. Conception must include all the essential features of the invention of the count, and must be manifested or proved by exterior acts or disclosures." In the light of the facts herein appearing, the position taken by the board finds support in previous rulings of the court. See Land v. Dreyer, 155 F.2d 383, 33 C.C.P.A., Patents, 1108, and Field v. Knowles, 183 F.2d 593, 37 C.C.P.A., Patents, 1211.

In discussing Cislak's alleged actual reduction to practice of July 7, 1943, and the further experimental activities supposedly in confirmation thereof, the board stated:

"* * * Dr. Rieger admitted that he never recovered or separated any relatively pure vinyl pyridine from the mixture resulting from any of his runs. Dr. Rieger testified that Dr. Sutherland performed one such fractionation but he, Dr. Rieger, did not observe the whole course of the separation.

"Dr. Sutherland testified that he made a separation of relatively pure vinyl pyridine from Dr. Rieger's product, and that on page 41 of notebook 1281 is a record of such

separation, the presence of vinyl pyridine being determined by index of refraction. Dr. Sutherland further testified that he did not know from which of Dr. Rieger's runs the material he separated was obtained or how it was produced. On the reverse side of page 55 of Rieger's notebook (Exhibit No. 3) it is stated '177 g. of the product page 55 was fractionated by L.H.S.' (page 41 bk 1281) which corresponds to the 177g used by Dr. Sutherland in the fractionation. Assuming that the material thus fractionated by Dr. Sutherland was produced by Dr. Rieger in the run set out on page 55 this does not constitute an actual reduction to practice of the process defined in the count. The count requires that the dehydrogenation be carried out at a temperature within the range of from approximately 500° C. to approximately 650° C. The temperature recorded on page 55 'is 690–700°' which is not within the range of the count.

"There is no evidence of any other separation of vinyl pyridine from any of Rieger's products. It is further noted that of all the runs recorded by Rieger totalling 49, only 10 of them included a cracking of ethyl pyridine at a temperature within the range set out in the count, and in two of these no vinyl pyridine was detected in the product produced. As there is no evidence that any of the runs made by Rieger and recorded in Exhibit No. 3 conformed to the count in interference in that it included contacting ethyl pyridine with a dehydrogenation catalyst at temperatures within the range of from 500° to 650° C. and a recovery of the formed vinyl pyridine, these experiments cannot be held to constitute an actual reduction to practice of the process of the count."

It is clear, as stated by the appellee, that Cislak has not attempted, in his brief, to apply the count, element by element, to any run alleged to be an actual reduction to practice. Instead, the appellant endeavors to dispute the accuracy of the board's analysis of the tests in question by asserting a number of conclusions unfounded in fact. While we appreciate the difficult burden cast upon the appellant, as junior party, we cannot find in his argument supporting reasons for his claim that the board misapprehended and failed to give proper consideration to the established results of the experiments conducted, especially by Rieger, in behalf of Cislak. Accordingly, we find no reason to disturb the board's decision in this respect.

The board held that Cislak Exhibit 4, a report dated July 23, 1943 and signed by Dr. Rieger and Dr. Cislak on that date, was sufficient in its disclosure of the complete process of the count to establish conception on such date. No subsequent actual reduction to practice, as aforesaid, having been proved, Cislak was restricted to his constructive reduction to practice of December 20, 1943. In our opinion, an earlier date of conception has not been established. Though Cislak earnestly contends that Exhibit 4 was based on the results of experiments made prior to July 23, 1943, this allegation is not supported by proof and we are not at liberty to assume to the contrary.

Finally, it is necessary to review the merits of Cislak's contention that the board erroneously concluded that Wagner had proved conception of the invention as of July 13, 1943. It is Cislak's position that, if established at all, such cenception was subsequent to his own of July 23. While Wagner places reliance upon the date of July 13, 1943, as awarded to him by the board, he additionally asserts the dates of June 10, 1943, and at least as early as June 15, 1943 as dates sufficiently supported by evidence to establish conception.

The record indicates that a letter was written on March 25, 1943 disclosing the interest of the Phillips Petroleum Company, for whom Wagner was consulting chemist, in commencing armchair patent work on methods of making vinyl compounds. Thereafter, on April 10, 1943, a letter was written to Dr. Wagner requesting him to take over the problem of such work. On June 1, 1943, pursuant to instructions in aid of Dr. Wagner's task, a detailed report of a literature and prior art investigation came to the attention of Wagner, including in such report previously recorded methods for preparation of styrene, vinyl pyridine, and vinyl naphthalene. This report, Wagner Exhibit 2, described preparation of styrene and vinyl naphthalene by passing the vapors of ethyl benzene and ethyl naphthalene over a dehydrogenation catalyst at a temperature within the range specified in the present count to produce styrene or vinyl naphthalene and recovering the thus formed styrene or vinyl naphthalene. On June 10, 1943, Dr. Wagner, having studied the report, wrote to Phillips Petroleum Company advising that vinyl pyridine could be made in the same way as styrene or vinyl naphthalene. On June 14, 1943, this letter, Wagner Exhibit 1, was referred to Dr. Scarth, technical head of the Patent Department of Phillips Petroleum Company, who had previously familiarized himself with the contents of Wagner Exhibit 2, the report of June 1, 1943. While it is not entirely clear, it appears from the testimony of Dr. Scarth that he discussed the invention of making vinyl pyridine with Dr. Wagner on June 11 and 12 (which was before Scarth saw Wagner's letter of June 10, Wagner Exhibit 1) and fully understood at that time that Dr. Wagner contemplated dehydrogenation of ethyl pyridine to produce vinyl pyridine in the same manner as styrene was produced from ethyl benzene as set forth in Wagner's subsequently received report, Exhibit 1. Wagner's Exhibit 1 was assigned to Scarth's assistant, Mr. Dutcher, for fur-

ther processing. On June 15, 1943, Dutcher allegedly prepared a "Disclosure of Invention" from the information contained in Wagner's Exhibit 1 which was claimed to be in conformity with the process of the present count. While this record of June 15 was thereafter mislaid, the evidence indicates that it had been used prior to its disappearance as the basis for the final draft of a "Disclosure of Invention," Wagner Exhibit 10, prepared and initialed by Dutcher on July 13, 1943. The information contained in this record, Exhibit 10, is stated as coming from Dr. Wagner's letter of June 10, 1943, Exhibit 1. It is not disputed that this record, Exhibit 10, does, in fact, contain complete support for all elements of the count in interference. Dr. Wagner, however, did not sign Exhibit 10 until a subsequent time, stated by the board to be "allegedly at his next visit to Phillips Petroleum on July 27–31, 1943."

It appears to us that Dr. Wagner had no knowledge of the existence of Exhibit 10 until July 27, 1943 (which is subsequent to Cislak's conception) and it is somewhat problematical if he signed the particular disclosure in question on that date. Dr. Wagner stated, in effect, that while he had no specific recollection of signing Exhibit 10 on July 27, 1943, he did sign a number of disclosures on that date. The appellant urges, therefore, that the board's crediting the date of July 13, 1943 to Wagner as a date of conception was erroneous. It is further urged that Dr. Wagner did not himself prepare or originate the details of Exhibit 10 and that such disclosure, though adequate to support the count in interference, was not made by him but rather constituted a disclosure to him.

We recognize what might, at first impression, be considered a somewhat inconsistent position taken by the board in disallowing Wagner's claim to conception as of June 10, 1943, based on the disclosure of Exhibit 1, and thereafter allowing the date of July 13, 1943 based on the same disclosure. We are, how-

ever, not directly concerned with the issue of conception at a date prior to that awarded by the board to Wagner. In this respect, we are of the opinion that Wagner is clearly entitled to a date at least as early as July 13, 1943, for conception of the complete process of the count. We think the exhibits, as well as the testimony of Dr. Scarth and Mr. Dutcher, sufficiently support the premise that the information supplied by Dr. Wagner, incorporating the details set forth in the earlier report of June 1, 1943 (Exhibit 2), resulted in the preparation of the admittedly complete disclosure of July 13, Exhibit 10. We do not think that it is material on the facts presented herein that Dr. Wagner did not sign Exhibit 10 until July 27 or some later time, or that he did not know of the existence of that record until he did actually sign the same. Conception is less a matter of signature than it is one of disclosure. See Smith v. Kliesrath, 120 F.2d 1015, 28 C.C.P.A., Patents, 1293.

Subsequent to the filing of the record in this court, appellee filed a motion to correct dimunition of the record, seeking to have included certain documents described in the record. The motion was granted subject to an order of the court that the costs of printing the additional matter requested by appellee should be taxed on final decision. We find that the additional documents were proper parts of the record, that they should have been included in the original transcript, and therefore the costs of printing the same will be taxed against appellant.

Being of the opinion that Wagner was first to conceive and first to reduce to practice, the decision of the Board of Interference Examiners, for the reasons hereinbefore stated, is affirmed.

Affirmed.

JACKSON, J., retired, recalled to participate herein in place of GARRETT, C. J.